UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| | CIVIL No. |
| KALIMANTANO GmbH; | **COMPLAINT** |
| (a company under the laws of Germany) | |
| TOFIK DAVIDOFF; | **FOR ORDERS, DAMAGES AND** |
| KONSTANTIN FELDE | **INJUNCTIVE RELIEF BASED ON:** |
| (both German citizens) | |
| | **1. ANTICYBERSQUATTING** |
| Plaintiffs | **CONSUMER PROTECTION ACT, 15** |
| | **USC § 1125;** |
| | **2.  COMPUTER FRAUD AND ABUSE** |
| -against- | **ACT; 18 USC 1030;** |
| | **3. DECLARATORY RELIEF;** |
| GODADDY, LLC, aka GODADDY.COM, | **4. DEFAMATION;** |
| INC., aka GODADDY GROUP, INC. | **5. DAMAGE TO BUSINESS** |
| (Arizona entities with office in D.C.); | **REPUTATION;** |
| GOOGLE, INC. | **6. INVASION OF PRIVACY;** |
| (California corporation with office in | **7. INJUNCTIVE RELIEF** |
| D.C.); | |
| FACEBOOK, INC. | |
| (California corporation with office in | |
| D.C.); | |
| MICROSOFT INC. | |
| (State of Washington and Delaware | |
| corporation with office in D.C.) | |
| and DOES from 1 to 100 | |
| | |
| Defendants | |

## I.  NATURE OF ACTION

This is an action pursuant to the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d), the Stored Communications Act (SCA), 18 U.S.C. §2701 *et seq.*, the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. §1030, and under State law, without limitations.  Plaintiffs seek award of various damages on multiple causes of action, as well as for the orders including for injunctive relief.  The present action may be related to another action in sister U.S. District Court, *Kalimantano et al. v. Motion in*

1

*Time Inc. et al.*, Docket 12cv6969, pending in the U.S. District Court for the Southern District of New York, as described below.

## II. PARTIES.

1.     Plaintiff KALIMANTANO GmbH (hereinafter "KALIMANTANO") is a company registered in the Federal Republic of Germany, with main offices at:  Louisen Strasse 98, 61348, Bad Homburg, Germany.  KALIMANTANO, located in one of the suburbs of Frankfurt am Main (also known as Frankfurt), is in the business of foodstuffs' wholesale and supplies to stores and customers in Germany.  The operating and sales website of KALIMANTANO could be found at this link: www.kalimantano.de.  That company, founded in 2001, has been in good standing in Germany at all times, with the following registration information: HRB 11537, Amtsgericht Bad Homburg, tax ID 00323705022, Ust - Id Nr. DE 813474195.  KALIMANTANO became the subject to the defamation campaign on the Internet, facilitated by Defendants herein.

2.     Plaintiff TOFIK DAVIDOFF (hereinafter also "DAVIDOFF") is a German citizen.  DAVIDOFF is a prominent businessman, one of KALIMANTANO's operating managers and principals.  His address is: c/o Kalimantano GmbH, Louisen Strasse 98, 61348, Bad Homburg, Germany.  Among facts relevant here, DAVIDOFF paid from KALIMANTANO's account $120,000 to the account of Defendants at Bank of America, but received no merchandise that he ordered.  DAVIDOFF became the subject of the defamation campaign on the Internet, facilitated by Defendants herein.

3.     Plaintiff KONSTANTIN FELDE (hereinafter also "FELDE") is a German businessman, one of the operating managers of KALIMANTANO.  His address, for purposes of this action, is: c/o Kalimantano GmbH, Louisen Strasse 98, 61348, Bad Homburg, Germany.  Among other reasons for being Plaintiff herein, FELDE has been

designated by the ultimate customers as the trustee for the purposes of returning of a particular defective watch, cited above, and transferring the refund.  FELDE also suffered damages from the defamation campaign on the Internet, facilitated by Defendants herein.

4.      Defendant GODADDY LLC, also known under the alternative corporate names GODADDY.COM, INC., and GODADDY GROUP INC., and THE GO DADDY GROUP INC. (hereinafter also "GODADDY") is an Arizona entity, representing the same business, using different corporate names, without independent corporate existence, with the offices at: 400 N Capitol Street, NW, #5856, Washington, D.C., 20001. GODADDY is the major provider and registrant of Internet domains for the worldwide web, offering also advertisements on the Internet.  As relevant in this action, it provided the registration and the use of the domain: http://tofikdavidoff.com, which has been used for fraudulent and defamatory purposes, defaming the businessman's name of DAVIDOFF, which is described more in detail below.

5.      Defendant GOOGLE INC. (hereinafter also "GOOGLE") is a California corporation, whose stock is publicly traded, with offices at:  1101 New York Ave., NW, 2nd Floor, Washington, D.C., 20005.  GOOGLE has established and developed the leading Internet search engine that provides search results on words and terms. GOOGLE's search engines have been used for the defamatory campaign against DAVIDOFF, effecting KALIMANTANO and FELDE.  GOOGLE ignored Plaintiffs' requests to cooperate in removing the search references to the prima facie defamatory webpages.

6.      Defendant FACEBOOK, INC. (hereinafter also "FACEBOOK") is a California corporation, whose stock is publicly traded, with offices at: 1155 F Street, NW, Suite 475, Washington, D.C., 20004.  FACEBOOK is a social media corporation

that connects users and posts information.  FACEBOOK's social network has been used for the defamatory campaign against DAVIDOFF, effecting KALIMANTANO and FELDE.  FACEBOOK ignored Plaintiffs' requests to cooperate in removing the prima facie defamatory information from its network.

7.     Defendant MICROSOFT, INC. (hereinafter also "MICROSOFT") is a corporation under the laws of State of Washington and Delaware, whose stock is publicly traded, with offices at: 901 K Street, NW, Washington, D.C., 20001.  Microsoft is the leading software developing corporation, which operates the search engines Bing and Outlook.  MICROSOFT ignored Plaintiffs' requests to cooperate in removing from its web search engines references to the prima facie defamatory concerning Plaintiffs.

8.     The issues in this lawsuit are intertwined with a lawsuit by the same three Plaintiffs, plus one more party, against five defendants, based on the same set of facts and seeking other remedies, namely captioned *Kalimantano et al. v. Motion in Time Inc. et al.*, Docket 12cv6969(PAE), pending in the U.S. District Court for the Southern District of New York, since September of 2012.  The different venue for this lawsuit was dictated by the fact that GODADDY, the key defendant in this matter, does not have offices in New York, but it has offices in Washington, D.C.

9.     The following parties, defendants in the above case, Docket 12cv6969, brought under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1961 *et seq.* that are non-parties in this matter, are enumerated hereinafter, too.

10.    Non-party MOTION IN TIME, INC. (hereinafter also "MIT") is a corporation registered in the State of New York, at the address: 56 West 47 Street, New York, NY, 10036, which also stands for its shop's location.  It was incorporated on January 24, 2004, #2998638, at the above address, with no registered agent.  MIT is in

4

the retail business of selling, buying and reselling jewelry and expensive watches, both at its shop at the above address and through its website: www.motionintime.com.  MIT has also been regularly using for its sales direct e-mail advertisements and direct proposals to sell certain items, circulated both as solicited and unsolicited e-mails.

11.     Non-party EDDIE SHAMAYEV, aka Edward Shamayev, aka Eduard Shamayev, aka Eddie Shamay (hereinafter "SHAMAYEV") is a principal and founder of MIT, and he is either a salesperson at his shifts therein.   On information and belief, SHAMAYEV is an immigrant, originally from Tajikistan (one of the Republics of the former USSR).  SHAMAYEV resides in New York, with the address: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036.  SHAMAYEV has also been doing business under at least two corporate names, neither of which is in good standing in New York, but which he occasionally used for his business purposes.

12.     Non-party MICHAEL SHAMAYEV, aka Mikhail Shamayev, aka Mihail Shamayev, aka Mikhail Shamay (hereinafter "MICHAEL") is SHAMAYEV's brother and one of the principals of MIT, also working at its store as a salesperson.  MICHAEL also resides in New York, with the address: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036.  MICHAEL has been linked to another address: Forrest Hills 105-21, 66 Avenue, New York, NY, 11375.  MICHAEL, inter alia, obtained in Frankfurt, Germany, on false pretenses, €143,000 in cash, while selling and handing over a defective item, a watch.  While subsequently facing the demand of returning the item and of the refund, MICHAEL engaged, with others, in the extortionist campaign, using the Internet means, seeking to coerce Plaintiffs to abandon their lawful claims.

13.     Non-party BORIS SHAMAYEV, aka Boris Shamay (hereinafter "BORIS") is SHAMAYEV's son and one of MIT's principals, on information and belief,

also working at its store as a salesperson.  Boris also resides in New York, with the address: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036. BORIS was the person who initiated various e-mails that constituted wire frauds and made a number of phone calls from New York, targeting Plaintiffs.  BORIS likewise engaged in a conspiracy with the other Defendants, to pursue extortionist activities, including using the Internet means, as described herein.

14.     Non-party DAVID SHAMAYEV, aka David Shamay (hereinafter "DAVID") is SHAMAYEV's other son, who is also one of MIT's principals, also working at its store as a salesperson.  DAVID also resides in New York, with the address: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036.  DAVID was the person who construed various defamatory websites, targeting Plaintiffs, and engaging, in a conspiracy with the others, in extortionist activities, for purposes of retaining the moneys obtained on false pretenses.

## II. JURISDICTION.

15.     This Court has jurisdiction because of the diversity of citizenship pursuant to 28 U.S.C. §1332.  For purposes of jurisdiction, one Plaintiff is incorporated in Germany and two other Plaintiffs are citizens and residents of the Federal Republic of Germany.  They have never resided in the USA.

16.     For purposes of the diversity of citizenship, all four Defendants are subject to general jurisdiction of the District of Columbia, because they maintain permanent offices within the District of Columbia and do business in this jurisdiction.  Their location for purposes of this action is different from Plaintiffs' location overseas.

17.    There is thus a complete diversity of citizenship here.  The amount in controversy, exclusive of interest and costs, is in excess of the statutory minimum of $75,000.

18.    Jurisdiction of this Court is proper in light of the question of the federal law in this action, i.e. the claims asserted against Defendants herewith pursuant to the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d) and other federal law.

19.    Jurisdiction of this Court and venue are proper because it may grant and enforce relief of preliminary and of permanent injunction sought in this action against GODADDY and other Defendants herein with their offices in the District of Columbia.

### III.  UNDERLYING FACTS.

A.  Circumstances of Emergence of False Allegations and Defamatory Website.

20.    The family of the immigrants from Tajikistan, one of the Republics of the former Soviet Union, the SHAMAYEVS, has been in the business of selling, buying and reselling jewelry in the State of New York, doing sales to buyers also in other States, for almost two decades.  Its initial customers were primarily also immigrants from the former USSR, and therefore their business/trading name in use was AmRus Jewelry, Ltd. (American-Russian Jewelry).  Later the SHAMAYEVS expanded and diversified their clientele beyond the Russian-speaking immigrants' community in New York.

21.    The SHAMAYEVS' family worked, at all relevant times, at the jewelry store, whose main staff consisted, on information and belief, of SHAMAYEV, his brother MICHAEL, as well as SHAMAYEV's sons BORIS and DAVID.

22.     In or about 2006, the SHAMAYEVS opened a store at the prime location in Manhattan, at 56 W 47th Street, New York, NY, 10036, in the so called 'diamonds district', in proximity of numerous other jewelry shops, boutiques, and businesses.

23.     In addition to selling, buying and reselling jewelry, the SHAMAYEVS also have been offering the watches' repairs and they have also been selling watches of expensive brands.   Selling watches has been becoming the SHAMAYEVS' prime occupation over the years.   After the incorporation of MIT in 2006, their business went mostly under that new trading name, used on their shop.

24.     The SHAMAYEVS extended their retail business, operated out of their shop, by offering watches and jewelry online, through their website, as mentioned above, www.motionintime.com.   On information and belief, the SHAMAYEVS obtained or bought from different sources the lists of e-mails of potential buyers and customers and undertook the direct mailing of their offers by circular e-mails upon the lists that they obtained from different sources.   The usual e-mails offered very big discounts (up to 65%) on watches, such as Cartier, Rolex, Patek Philippe, Chopard, Perrelet, Hublot, Omega, Breguet, Roger Dubuis, et al.

25.     On information and belief, neither the SHAMAYEVS, nor the corporations associated with them, i.e. MIT and two other corporations, currently dissolved, AmRus Jewelry, Ltd. and Eddie Jewelry, Ltd., have ever been authorized to act as retailers of any of those luxury brands of watches.   Despite the apparent lack of permissions or certification, MIT's circular e-mails, offering particular watches produced in limited series, were designed in a manner that was calculated to draw an inference that MIT was an authorized retailer for those brands and producers.

26. SHAMAYEV and others from his family associated with the MIT store, as enumerated above, have been subject to a number of lawsuits in the Supreme Court of New York, in Manhattan, and other courts in the State of New York. Some of the lawsuits were associated with their three corporations, i.e. MIT and two dissolved entities.

27. One of those who were receiving the direct marketing and promotional e-mails from MIT, including announcements of 'blowout sales' of watches, was a German businessman, DAVIDOFF. Since about 2009, DAVIDOFF was periodically receiving MIT's e-mails offering very unusual discounts on the watches of the luxury brands such as Cartier, Patek Philippe, Chopard, Perrelet, Hublot, Roger Dubuis, et al.

28. As mentioned above, many of those e-mails sent by SHAMAYEVS contained promotional messages: "Blowout Price!!!!", etc. On information and belief, those promotional e-mails were misleading. Namely, the watches offered through e-mails were not what for real, either being not new, or after repairs, or simply unavailable when an order would be placed, whereas alternatives would be offered instead.

29. In December of 2011, DAVIDOFF was approached by his trading counterparts in Kazakhstan, asking him to assist them in locating good deals on luxurious watches. To DAVIDOFF's misfortune, leading to his subsequent nightmarish experience, DAVIDOFF was unlucky to recall about those promotional e-mails with offers from MIT and SHAMAYEVS and got back to them.

 (B) Defendants' Fraud of Selling a Defective Item for Cash in Frankfurt.

30. In December of 2011, DAVIDOFF, acting in the interests of his trading counterparts in Kazakhstan, arranged for the purchase of an expensive watch of the Swiss

brand 'Patek Philippe', model 5970, offered to him by the SHAMAYEVS through MIT's e-mails.

31.     Relying on the representations made by SHAMAYEV, MICHAEL and BORIS, DAVIDOFF arranged for the trip to Frankfurt, Germany, of his customers from Kazakhstan, Nurgali Dossanbayev (hereinafter "Dossanbayev"), Ruslan Azizov (hereinafter "Azizov") and Spiro Mantidi (hereinafter "Mantidi").  Dossanbayev, Azizov and Mantidi were also to come to buy other luxury watches in the stores in Frankfurt.

32.     The SHAMAYEVS and MIT, on the one hand, and DAVIDOFF, on the other hand, agreed that MICHAEL would also fly from New York to Frankfurt, Germany, to bring the offered watch, to meet with the end customers and to consummate the sale.  Specifically, at no time before his arrival in Frankfurt did the SHAMAYEVS indicate that they would require for that item the payment in cash and not through a bank account.

33.     MICHAEL asked for, and obtained from KALIMANTANO, a refund for buying his round trip flight from New York to Frankfurt, Germany, based upon his presentations that he would bring for sale the certified item in an immaculate condition.

34.     On January 4, 2012, at about 10 A.M., DAVIDOFF met MICHAEL at the airport in Frankfurt and brought him to Hilton Hotel in Frankfurt (at the address Hoch Strasse 4), Room 426, reserved and paid for by KALIMANTANO.  See Exhibit D.

35.     Also on January 4, 2012, later in the same morning, DAVIDOFF's associate FELDE met at the airport three incoming customers from Kazakhstan, namely Dossanbayev, Azizov and Mantidi.  FELDE also brought them to the same Hilton Hotel.

36.     At first joint meeting in the lobby of the hotel, MICHAEL met with DAVIDOFF, FELDE, and three incoming customers from Kazakhstan who just arrived from the airport.

37.     MICHAEL then demonstrated to them the watch, Patek Philippe, model 5970, and demanded from the buyers "to show the money".

38.     The customers, Dossanbayev, Azizov and Mantidi, asked MICHAEL to explain what he meant by that because, obviously, nobody carried cash in such amounts. Furthermore, MICHAEL never made that proposition to require cash at any time before he met with the customers at the hotel. The incoming customers offered to pay from a bank account to MIT's bank account. MICHAEL thus, unexpectedly, declined to sell that watch, Patek Philippe, that he showed, other than for cash.

39.     Having discussed that unexpected situation, Dossanbayev, Azizov and Mantidi made phone calls to Kazakhstan, making the arrangements for an urgent availability of the cash on two accounts, in the name of Dossanbayev and Azizov. The arrangement was made that they could use those two accounts in their names for withdrawing cash from the branches of Commerzbank and from ATM machines in Frankfurt.

40.     Upon their telephone calls to their associates back in their home country, the money was thus promptly made available on their two accounts at BTA Bank in Kazakhstan, for cash withdrawals in Germany.

41.     Experiencing great inconvenience and losing on bank fees for the ATM transactions, normally limiting a withdrawal by €2,000 at a time, Dossanbayev and Azizov were compelled to visit a number of branches and use ATMs in Frankfurt, in order to promptly withdraw the necessary money in cash in Euros.

42.     Plaintiffs have the full banking records from BTA Bank that prove all those transactions and withdrawals of cash by Dossanbayev and Azizov.  Those banking records show the cash withdrawals, with the precision of time up to a minute and up to a second, including the address of the bank branch or of the ATM machines.

43.     Upon withdrawing the necessary money in cash, the visitors returned to the Hilton hotel to meet with MICHAEL and complete the purchase of the item that MICHAEL had shown.  The price was €143,000, calculated to match $175,000 at the exchange rate of the day.

44.     DAVIDOFF and FELDE accompanied Dossanbayev and Azizov to the room, where MICHAEL was staying, Room No. 426.

45.     MICHAEL then counted the tendered cash in Euros, in the presence of four persons: DAVIDOFF, FELDE, as well as the foreign buyers, Dossanbayev and Azizov.

46.     Upon physically counting, by hand, €143,000 (in the Euros) in his room, MICHAEL confirmed that the amount tendered in cash was correct, and then passed the watch, Patek Philippe, 5970, in a box.  MICHAEL assured that the watch was new, certified and in an impeccable condition.  The customers relied on MICHAEL's assurances.  MICHAEL also paid a commission of €8,000 to DAVIDOFF as an intermediary for that sale, for connecting him to the ultimate buyers and organizing the meeting.

47.     After that purchase was consummated, DAVIDOFF invited all the participants to the restaurant called 'The Ivory Club' at Taunusanlage 15, D-60325, in Frankfurt.  The participants at the dinner included DAVIDOFF, his wife, MICHAEL, and Azizov.  They all dined from about 7 P.M. to 11 P.M., in a very friendly mood.  At no

time did MICHAEL express any allegations against DAVIDOFF at the dinner or at any time in Germany.

### (C) Circumstances of Emerging False Pretenses of "Stealing"

48.    On the next day, January 5, 2012, DAVIDOFF discussed with MICHAEL making two more purchases from him.  One order was for one more watch 'Patek Philippe' 5970, and another for Audemars Piguet Montoya watches (500 pieces).

49.    Against MIT's invoices showing those items, DAVIDOFF made on that day two wire transfers for the prepayment of the advance on those items, for $50,000 and $70,000, in two separate wire transfers to MIT's account at Bank of America, from KALIMANTANO's account at Commerzbank in Frankfurt.

50.    Exhibits A and B annexed to the Complaint represent the banking records showing those advance payments for those orders, for the total of $120,000.  The balance was to be paid by KALIMANTANO upon the actual delivery of the ordered items from MIT, eventually again to Frankfurt.

51.    In the morning of January 6, 2012, MICHAEL took the return plane to New York.  MICHAEL had at his disposal €135,000 in cash after the sale of the watch.

52.    On information and belief, MICHAEL carried that cash in the amount of €135,000 received from the customers on the eve, to the plane.  On information and belief, MICHAEL failed to report that money in the U.S. Customs and Border Protection form (6059B Form), question #13, at the time of the reentry of the U.S. border.  Dossanbayev and Mantidi took their flight to Kazakhstan.  Azizov stayed for one more day.

53.    Later in January, DAVIDOFF repeatedly contacted MIT and the SHAMAEVS, asking for his new orders, for which he had wire-transferred the advance

payment, ready to pay the balance.   Each time, he got an explanation from the SHAMAYEVS and MIT that his two new orders were not yet ready for delivery.

(D) Smearing Campaign Posted through Defendants Used for Extortionist Threats.

54.     Unexpectedly to DAVIDOFF, FELDE and KALIMANTANO, the customers and buyers, Dossanbayev and Azizov, contacted them from Kazakhstan and advised that the Patek Philippe watch, model 5970, that they had purchased from MICHAEL, was actually a used item, whereas the manufacturer's seal was not intact nor a genuine one.

55.     Those customers advised DAVIDOFF that, having developed suspicions, they had shown the watch for inspection at one of the authorized retailers' shop.   The watch's identification number was traced, and it was determined that that watch was not a new one and was produced by Patek Philippe back in 2010.   Because the production seal was not genuine, even although craftily replicated, the presumption was that that watch had been repaired.

56.     The customers in Kazakhstan, the buyers of that watch, demanded to return the watch, Patek Philippe, 5970, back and to return the funds that they paid in Frankfurt.

57.     DAVIDOFF and KALIMANTANO immediately turned over that matter to SHAMAYEVS, asking for the required explanations and demanded to return the questionable watch and to refund the moneys paid for it.

58.     SHAMAYEV, MICHAEL and BORIS vaguely denied that the watch was not new and repaired, but failed to provide the documentary proof that the item in question was certified as a new item.   They declined to accept that watch back and to return the money MICHAEL received for it in Frankfurt.

14

59.    Furthermore, SHAMAYEV, MICHAEL and BORIS, completely changing their story, started to claim, fraudulently, that MIT's account at Bank of America was never credited with $120,000 towards the new purchase of the items ordered by DAVIDOF and KALIMANTANO on January 5, 2012.  However, the wire transfers' funds were never returned back to KALIMANTANO through the banking channels.

60.    DAVIDOFF's telephonic inquiries from MIT were met with an ever growing irritation and aggressiveness on the part of the SHAMAYEVS, who started to falsely accuse DAVIDOFF and MIT of various frauds, all without any substance.

(E) Shamayevs' Threats to Plaintiffs as a Part of Campaign to Destroy.

61.    Furthermore, the SHAMAYEVS started to make threats to DAVIDOFF, stating that his safety would be in jeopardy, unless DAVIDOFF dropped the refunds' matter and unless he and KALIMANTANO wrote off all the losses that they incurred through MIT.

62.    Those repeated threats by the SHAMAYEVS to DAVIDOFF culminated in SHAMAYEV's phone call to DAVIDOFF that was made on June 14, 2012 at 11:59 P.M. local time in Germany, i.e. 5:59 PM EST in New York.  As the phone records show, that conversation, initiated by SHAMAYEV, lasted 11 minutes.  In that phone call that SHAMAYEV initiated from his phone in New York, knowing that it was already night-time in Germany, SHAMAYEV made threats and shouted vulgar obscenities, with the most menacing tonality and implications.

63.    Specifically, SHAMAYEV threatened DAVIDOFF that he would physically harm DAVIDOFF and his family, that he would destroy them.  Furthermore, SHAMAYEV also said that he could contract murdering DAVIDOFF.  SHAMAYEV also engaged in a litany of vulgar obscenities addressed to DAVIDOFF and his family.

64.     On the next day, June 15, 2012, at 9:51 A.M. in Germany, DAVIDOFF wrote back to SHAMAYEV an e-mail, to memorialize that conversation, namely that SHAMAYEV had made insults, threats to him and to his family.

65.     On June 18, 2012, KALIMANTANO and DAVIDOFF lodged with the Attorney General of Hessen Province (Land) in Germany, with main offices in Frankfurt, the criminal complaint against the SHAMAYEVS.

66.     The Attorney General's Office of Hessen Province opened the criminal inquiry against the SHAMAYEVS, including against BORIS, which was confirmed by the letter to KALIMANTANO of June 29, 2012, docket No. 8208.

(F) Defendants' Facilitating Defamation Campaign against Plaintiffs

67.     In response to the initiation of the criminal proceedings in Germany, the SHAMAYEVS caused a most denigrating campaign launched against DAVIDOFF on the Internet.

68.     SHAMAYEVS purchased from GODADDY a website domain, www.tofikdavidoff.com, creating a website with the headlines "Tofik Davidoff: A Man You Can't Trust".  On that website, misusing another person's name, the SHAMAYEVS posted a so called "Stolen Watch Alert".  They falsely accused DAVIDOFF as though he had "stolen" the watch, Patek Philippe, Ref. No. 5970P-001, Serial No. 3931765/4500264.  That was the same watch that DAVIDOFF had helped MIT sell to the customer in Kazakhstan and then attempted to have returned and moneys paid refunded, once the watch was determined to be defective.

69.     That website was maliciously created, according to the website records, by DAVID, who essentially illegally hijacked another person's identity, to create a defamatory website in DAVIDOFF's name.

70.     Likewise, the SHAMAYEVS, carrying out their threats to destroy DAVIDOFF and KALIMANTO by all possible means, started to post the same or similar messages and "alerts" on numerous websites.

71.     Those defamatory webpages and the illegal website became prominent on searches on the names of DAVIDOFF and KALIMANTANO, based on the search results of GOOGLE, FACEBOOK and MICROSOFT.

72.     Since June of 2012, upon any searches on those names, such defamatory webpages essentially eclipsed any other web information on DAVIDOFF and KALIMANTANO.

73.     Repeating the litany of their false accusations, those webpages and the illegal website claimed as though DAVIDOFF had "stolen" that watch.  No details were provided in any of those defamatory messages, but those made it appear as though DAVIDOFF walked into MIT's store and allegedly "stole" that watch.   In fact, DAVIDOFF never even visited that store in New York.

74.     Acting with an unspeakable malice and ruse, the SHAMAYEVS also copied DAVIDOFF's pictures on certain websites and posted those together with the alerts brandishing his name as that of a thief who, according to their false claims, had stolen a watch from MIT.

75.     In a particular instance, the SHAMAYEVS also obtained from some sources an image of DAVIDOFF's passport as the citizen of Germany and posted DAVIDOFF's passport's image on the defamatory webpages.

76.     All those defamatory postings by the SHAMAYEVS, attacking DAVIDOFF, were patently fraudulent and false, unspeakable and extreme in their

offensiveness, brazen in their claims and in their use of the Internet capabilities, calculated to destroy the reputation of their target.

77. As a result of that malicious defamatory campaign orchestrated and staged by the SHAMAYEVS, KALIMANTANO's business incurred very substantial damages. Its reputation in Germany was smeared, and numerous customers either avoided buying from KALIMANTANO, or curtailed their accounts.

78. Likewise, DAVIDOFF's personal reputation was suddenly very seriously damaged. Anyone making a simple search on the Internet on DAVIDOFF's name would see the numerous MIT's highly offensive postings on at least dozen web portals or websites, falsely calling DAVIDOFF 'a thief', who had allegedly 'stolen a watch', the Patek Philippe, 5970, presumably from the MIT store.

79. In fact, such false allegations were made against the background that DAVIDOFF, again, never even visited MIT's store in New York and met with nobody from MIT other than once with MICHAEL in Frankfurt, when MICHAEL sold that watch to the foreign customers, obtaining cash. In order to ascertain all the relevant circumstances, MICHAEL never made any allegations or made any statements to the German law enforcement neither in the course of his trip to Germany on January 4-5, 2012, where this would have been required, nor, on information and belief, at any other times to date. All those allegations against DAVIDOFF were entirely made up by the SHAMAYEVS.

80. SHAMAYEVS were fully aware that their brazen and malicious accusations of DAVIDOFF that they caused being highly aggressively posted on the Internet, were patently false and a product of pure fabrication.

81.    That included DAVID, who, as evidence shows, personally created a defamatory website www.tofikdavidoff.com.

82.    The SHAMAYEVS' objective was to discourage DAVIDOFF and KALIMONTANO from pursuing the lawful means to recover from SHAMAYEVS the moneys actually paid, towit $120,000 and €135,000, and returning to them their defective watch Patek Philippe, fraudulently sold as new and certified item, which it was not.

G) Defamatory Campaign Reflected by Defendants on Internet

83.    As mentioned above, GODADDY has been maintaining a falsely registered website www.tofikdavidoff.com, that can be accessed through a number of search engines.  It was improper for GODADDY to maintain the website that, upon its glance, appeared to be used for maligning the person under that name, DAVIDOFF.

84.    The search of GOOGLE provides, from the first pages, dozens of defamatory webpages. For example, the following webpages have been especially maintained with the particularly malicious contents:  Images for tofik davidoff - Please report the offensive image:

- WatchNet: Deal Watch: Beware of Tofik Davidoff, Dealers and Watch ... forums.watchnet.com/index.php?t=tree&goto=558766&rid=0Jul    4,    2012    – "Beware of Tofik Davidoff, Dealers and Watch Enthusiast Beware Read Carefully"."Tofik Davidoff - The Man You Can't Trust, tofikdavidoff.com"

- Patek Philippe Stolen 5970P ALERT - TOFIK DAVIDOFF STOLEN PATEK ... watchcrowd.com/.../Patek-Philippe-Stolen-5970P-ALERT-TOFIK-...Used    Patek Philippe Watches For Sale - Dear Friends and Watch Enthusiasts, It is unfortunate for us to have to report that we have been a victim of Wire Fraud;

- tofik davidoff, tofikdavidoff5970.blogspot.com;

- Patek Forum: tofik davidoff 5970P beware, www.watchnetwork.com › Brand Forums › Patek ForumSep 24, 2012 – Dear Friends and Watch Enthusiasts,. We are posting this for others not to get defrauded and to beware!;

- patek philippe stolen 5970p alert tofik davidoff stolen patek 5970p ...

- newyork-ny.americanlisted.com/.../patek+philippe+stolen+5970p+ale...patek philippe stolen 5970p alert tofik davidoff stolen patek 5970p perpetual chrono wire fraud22046917html Watches and jewelry in New York;

- PATEK  PHILIPPE  5970P  STOLEN  ALERT  -  TOFIK  DAVIDOFF  ... www.watch2watches.com › ... › PATEK PHILIPPE - 5970p stolen alert - tofik davidoff stolen patek 5970p perpetual chrono - wire fraud alert.

85.    To make the effect of the offensive and defamatory information even worse, GOOGLE not only simply has been listing the webpages, but also providing a snapshot summary on 2-3 lines, which enhanced the defamatory information.

86.    Likewise, FACEBOOK has been maintaining the webpages with the fraudulent and offensive contents.  That included, for example, to following:

- Watchesandart  -  watch  blog:  Stolen  watch  alert:  Patek  5970  ... watchesandart.blogspot.com/2012/06/stolen-watch-alert-patek-5970...  - Watchesandart - watch blog · Published Jun 15, 2012, Jun 20, 2012 · Mr. Tofik Davidoff  purchased  a  Patek  Philippe  5970P  with  serial  numbers 3931765/4500264 from us in January 2012. He committed wire …

- Patek  Forums  -  Patek  Philippe  Watch  Strap  -  Watch  Winders ...https://www.watchnetwork.com/forums/patek tofik davidoff 5970P beware. Re: tofik davidoff 5970P beware by motionintime on Sep,24,2012 09:2

87.    Likewise, MICROSOFT, operating several search engines, including Bing and Internet Explorer, has been maintaining defamatory postings, for example the following links' summaries:

- Watchesandart  -  watch  blog:  Stolen  watch  alert:  Patek  5970 ...watchesandart.blogspot.com/2012/06/stolen-watch-alert-patek-5970...  By  - Watchesandart - watch blog · Published Jun 15, 2012, Jun 20, 2012 · Mr. Tofik Davidoff  purchased  a  Patek  Philippe  5970P  with  serial  numbers 3931765/4500264 from us in January 2012. He committed wire…

- Patek  Forums  -  Patek  Philippe  Watch  Strap  -  Watch  Winders ...https://www.watchnetwork.com/forums/patek; tofik davidoff 5970P beware. Re:tofik davidoff 5970P beware by motionintime on Sep,24,2012

- Patek Philippe Stolen 5970P ALERT - TOFIK DAVIDOFF STOLEN ... watchcrowd.com/watch-forum-listing/Patek-Philippe-Stolen-5970P-ALERT-TOFIK-...Used Patek Philippe Watches For Sale - Dear Friends and Watch Enthusiasts, It is unfortunate for us to have to report that we have been a victim of Wire Fraud.

**COUNT I. RELIEF UNDER THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT, 15 U.S.C. § 1125(d)**
**(Kalimantano and Davidoff against Godaddy)**

88.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 87 above, as if restated herewith with the same force and effect.

89.    As mentioned above, GODADDY is engaged in the business of providing, in exchange for a fee, internet-based website hosting and domain name registration. GODADDY also offers online advertising and online auction services.

90.    As mentioned above, GODADDY registered the domain: www.tofikdavidoff.com, on which it posted false information about the prominent business person, DAVIDOFF.  That conduct continued and the website was preserved despite the various protestations of DAVIDOFF.  It was also clear from the website's contents that it was unauthorized and pursued unlawful aims.

91.    15 U.S.C. §1129 protects any living person from having their personal name included in a domain name, when the domain name is registered for profitable resale.  Here, the domain name was registered for extortionist and racketeering purposes, and can be deemed protected by that statute.

92.    It has been established that the domain name registrar or registry or other domain name authority, such as GODADDY, is liable for injunctive or monetary relief in the case of bad faith or reckless disregard.

93.     Plaintiffs are entitled to relief under the Anticybersquatting Consumer Protection Act, 15 U.S.C. §1125(d), to the full extent of the applicable law.

## COUNT II.  RELIEF UNDER COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. §1030
### (Davidoff against John Dow)

94.     Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 87 above as if stated herewith with the same force and effect.

95.     Plaintiffs reiterate that the passport image of DAVIDOFF's passport, containing his picture and all unredacted information, was illegally obtained, by, on information and belief, SHAMAYEVS and John Dow, from a certain protected computer or network.

96.     The perpetrator, still designated as John Dow, obtained the passport image through computer devices used in or affecting interstate or foreign commerce or communication, including a computer located outside the U.S. used in a manner that affects interstate or foreign commerce.

97.     Said conduct was malicious and fraudulent.  Upon illegal access to the image of the passport, SHAMAYEVS posted that information on the Internet.

98.     With the due disclaimer that Plaintiffs, particularly DAVIDOFF, are not yet in a position to identify, with the definite precision, the proper defendants under that Count, Plaintiffs tentatively identify such Defendant still as John Dow, with the subsequent identification in the course of this action.

99.     Plaintiffs are entitled to relief under Computer Fraud and Abuse Act, 18 U.S.C. §1030.

//

//

## COUNT III.  DECLARATORY RELIEF.
### (Kalimantano and Davidoff against All Defendants)

100.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 87 above as if stated herewith with the same force and effect.

101.    DAVID, acting on behalf of the SHAMAYEVS, appropriated for his own use and for improper purposes, such as extortion and racketeering, the domain name: www.tofikdavidoff.com.

102.    It is appropriate for the Court to exercise its powers and discretion to issue a declaratory judgment that the use of that website was unlawful.

103.    Plaintiffs are entitled to relief under the Count of declaratory relief.

## COUNT IV.  DEFAMATION.
### (All Plaintiffs against All Defendants and John Dow)

104.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 87 above, as if restated herewith with the same force and effect.

105.    Shortly after Plaintiffs first claimed the proceeds to be refunded back to Plaintiffs and the watch Patek Philippe, 5970 be returned, the SHAMAYEVS the defamation campaign against KALIMANTANO and DAVIDOFF and made clear that they would make KALIMANTANO and DAVIDOFF regret dearly if they would pursue those claims.

106.    In fact, Defendants effectively carried out their threats, making the increasingly offensive statements concerning DAVIDOFF and KALIMANTANO to third parties, both orally by telephone and in writing, whereby using the highly offensive and false statements on the Internet, using the Internet facilities controlled by Defendants.

107.    In particular, Defendants assisted or at least allowed the SHAMAYEVS to circulate and publish using the Internet for the attention of third parties the false

accusations against DAVIDOFF and KALIMANTANO, as though KALIMANTANO's president DAVIDOFF was a 'thief', fraud, dishonest, and unreliable for the counterparts.

108.    After KALIMANTANO and DAVIDOFF lodged a criminal complaint against the perpetrators before the Attorney General's Office for Hessen Province in Germany, the SHAMAYEVS drastically intensified their complaint for the purpose of defaming DAVIDOFF.   Among other lines of attacks, Defendants assisted to the SHAMAYEVS in publishing the false information as though DAVIDOFF had allegedly 'stole' the watch 'Patek Philippe', 5970.

109.    In fact, Defendants' statements in the Internet, including setting up a fraudulent website: www.tofikdavidoff.com, essentially operated to hijack someone's identity for making patently untrue statements.   Defendants pursued their agenda to defame Plaintiffs, depriving them of their good faith reputation and discouraging their clients and customers from dealing with KALIMANTANO and DAVIDOFF.

110.    As mentioned above, DAVID, relying on the assistance of the Defendants herewith, was instrumental in creating a defamatory website in the name of DAVIDOFF, essentially engaging in the Internet piracy and defamation for the extortionist purposes.

111.    That malicious campaign, made possible by Defendants' facilities on the Internet, had in fact a very negative effect on KALIMANTANO's and DAVIDOFF's business, which was very much dependent upon their public image and reputation.

112.    Plaintiffs are entitled to relief under the count 'defamation'.

### COUNT V.  INTERFERENCE WITH BENEFICIAL BUSINESS RELATIONSHIP.
### (All Plaintiffs against All Defendants)

113.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 87.

114.    As the facts above show, Defendants allowed the publication on the Internet of a number of written statements, attacking KALIMANTANO and DAVIDOFF, smearing them through the use of the Internet.

115.    As cited above, those publications accused KALIMANTANO and DAVIDOFF as though they were dishonest, that DAVIDOFF allegedly 'stole' the certain watch, which MICHAEL actually sold to KALIMANTANO's customers and received the payment in cash for that.    FELDE, as a part of KALIMANTANO's management team, was also damaged.

116.    The result of such assistance of Defendants to the vicious and malicious attacks of the SHAMAYEVS was to defame KALIMANTANO and DAVIDOFF and to damage their business reputation.

117.    Consequently, the damage to Plaintiffs' reputation, given the turnover of their business in Germany, and the effect of diverting their customers and counterparts, could be assessed at over $1 million.

118.    Plaintiffs are entitled to relief for interference into the beneficial business relationship.

### COUNT VI.  INVASTION OF PRIVACY.
### (Davidoff against All Defendants)

119.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 87 above, as if restated herewith with the same force and effect.

120.    As the facts above show, Defendants allowed the SHAMAYEVS to undertake a malicious campaign of defaming DAVIDOFF and KALIMANTANO on the Internet, in particular accusing DAVIDOFF as though he had 'stolen' the watch in

question, Patek Philippe, 5970. Among other things, DAVIDOFF's passport was posted on the Internet, with Defendants' reckless ignoring its illegality.

121. The deliberately aggressive campaign, staged by SHAMAEVS, with the assistance of Defendants, smeared the reputation of DAVIDOFF and of KALIMANTANO. That included the use of a fraudulently created website and other means, at a minimum DAVIDOFF should be entitled to damages for intrusion of privacy.

122. That disclosure was public; the private facts, such as those in the passport, were disclosed; the matter publicized was highly offensive to reasonable person; and the matter of DAVIDOFF's passport was not legitimate concern to public. Such disclosure of private facts and false light invasion of privacy occurred through Defendants', using their enormous impact upon the Internet, giving the publicity to the matter in question.

123. DAVIDOFF is entitled to relief for invasion of privacy.

## COUNT VII. INJUNCTIVE RELIEF.
### (All Plaintiffs against All Defendants)

124. Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 87 above, as if restated herewith with the same force and effect.

125. As shown above, relying on the reckless lack of control over the suspect publications on the part of Defendants, the SHAMAYEVS engaged in posting on the Internet various fraudulent attacks on DAVIDOFF and KALIMANTANO, claiming as though DAVIDOFF had 'stolen' their watch 'Patek Philippe', 5970.

126. As mentioned above, this was an outright lie. DAVIDOFF never visited MIT's store in New York, nor ever visited the USA. When MICHAEL visited Frankfurt, requiring upfront the full refund of the air tickets from New York, he brought with him to the watch in question. MICHAEL sold that item for cash, in the amount of €135,000,

which he counted in his hotel room No. 426, Hilton Hotel in Frankfurt, in the presence of four (4) witnesses.

127.     Defendants should be ordered to immediately delete SHAMAYEVS' false, malicious and virulently fraudulent attacks on DAVIDOFF and KALIMANTANO. Defendants should also be ordered to withdraw or deactivate all their postings on the Internet that they undertook after June 15, 2012.

128.     Defendants should also be ordered to delete the defamatory website www.tofikdavidoff.com, created for extortionist purposes, intimidation and for causing ongoing damage to the reputation of Plaintiffs.   Defendants should be prohibited from such conduct concerning DAVIDOFF and KALIMANTANO in the future.

129.     Plaintiffs are entitled to relief under the count of injunctive relief.

## PRAYERS FOR RELIEF

THEREFORE, Plaintiffs request this honorable Court to grant relief as follows:

1)     To order GODADDY and all other Defendants inasmuch as they provide search engine services, to dismantle, and/or deactivate, and/or delete the defamatory website: http://tofikdavidoff.com;

2)     To order Defendants to delete all defamatory and false messages posted by the SHAMAYEVS and MIT;

3)     To order Defendants to delete images of DAVIDOFF's passport from the segments of the world wide net they maintain technical control over;

4)     To award damages against Defendants to the full extent of the applicable law;

5)     To issue a declaratory judgment that the above defamatory website was created in violation of the applicable law and may not be used by the SHAMAYEVS;

6)     To award attorneys' fees and costs;

7)      To grant such other and further relief as the Court deems proper.

Respectfully submitted:

Dated: December 12, 2012


/s/_____
GEORGE LAMBERT (D.C. Bar No. 979327),
LAW OFFICES OF LEONARD SUCHANEK
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 747 7797
E-mail: lawdc10@aol.com

Attorneys for Plaintiffs